IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 19-261 |
| | ) | |
| SHELBY SUMMER BROWN | ) | |

**SENTENCING MEMORANDUM CONCERNING**
**18 U.S.C. §§ 3553(a)(3) – (a)(6)**

Shelby Summer Brown, through counsel, submits this Memorandum concerning this Court's consideration of 18 U.S.C. §§ 3553(a)(3) through (a)(6). Ms. Brown asks that the Court reject the applicable guideline enhancements in U.S.S.G. § 2G1.3 on policy grounds because they do not punish conduct worse than the typical offense. Along with this memorandum, Ms. Brown has filed a separate memorandum in mitigation of sentence addressing § 3553(a)(1) & (a)(2). Together, Ms. Brown argues that these memoranda, along with argument and testimony to be presented at the sentencing hearing, support a sentence without further jail time.

On September 12, 2019, Shelby Summer Brown pled guilty to an information charging her with one count of coercion and enticement of an individual to engage in illegal sexual activity, in violation of 18 U.S.C. §§ 2422(a) and 2, and one count of conspiracy to commit that same offense, in violation of 18 U.S.C. § 371. Under the terms of her plea agreement, and as calculated by the Presentence Report, the parties stipulated that the Guidelines are technically calculated as follows:[1]

---

[1] PSR ¶¶ 24-35.

| Base offense level | § 2G1.3(a)(4) | 24 |
|---|---|---|
| Unduly influencing a minor | § 2G1.3(b)(2)(B) | 2 |
| Use of a computer | § 2G1.3(b)(3)(A) | 2 |
| Commercial sex act | § 2G1.3(b)(4)(A) | 2 |
| Adjusted offense level | | 30 |
| Acceptance of responsibility | § 3E1.1(a)-(b) | - 3 |
| Total offense level | | 27 |

Ms. Brown has a criminal history score of two, which places her in Criminal History Category II. Accordingly, her Guidelines range is 78 to 97 months' imprisonment.[2]

As argued below, this Court should vary downward for policy reasons and sentence Ms. Brown without the enhancements in 2G1.3. Without the enhancements, her offense level is a 21 and the applicable Guidelines range is 41 to 51 months. Additional variances should start from this lower range.

Ms. Brown has been in custody since March 19, 2018, which, as of January 14, 2020, is nearly 22 months. This is over half of the low end of the Guidelines range without the enhancements.

## I. The factors in 18 U.S.C. § 3553(a)(3) – (a)(6) warrant a variance below the Guidelines range.

The Court must fashion a sentence "sufficient, but not greater than necessary" to comply with the purposes of sentencing by considering the 18 U.S.C. § 3553(a) factors.[3] In addition to the nature and circumstances of Ms. Brown's offense

---

[2] PSR ¶ 70.
[3] The parsimony provision of 18 U.S.C. § 3553(a) is the "overarching principle" of sentencing, directing courts to impose a sentence "sufficient, but not greater than necessary," *United States v. Olhovsky*, 562 F.3d 530, 552 (3d Cir. 2009), considering:

and his history and characteristics, as addressed in a separate filing, the § 3553(a) factors (a)(3) through (a)(6) support a below-Guidelines sentence, and specifically, a sentence without further prison time, as explained below.

### A. The applicable legal standards authorize this Court to vary from the Guidelines based on a policy disagreement.

While the Court must consider the Guidelines when fashioning a sentence, it may not presume that a sentence within the advisory Guidelines range is appropriate. *Gall v. United States*, 552 U.S. 38, 50 (2007). Although "the Guidelines should be the starting point and the initial benchmark" for a sentencing determination, a sentencing court "may not presume that the Guidelines range is reasonable." *Id. Kimbrough v. United States*, 552 U.S. 85 (2007), permits a sentencing court to vary from the advisory Guidelines range based on a policy disagreement, and "even where a guideline provision is a direct reflection of a congressional directive." *United States v. Grober*, 624 F.3d 592, 609 (3d Cir. 2010)

---

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed-
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment…;
    (B) to afford adequate deterrence…;
    (C) to protect the public…; and
    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment…;
(3) the kinds of sentences available;
(4) the advisory Guidelines range;
(5) any pertinent policy statements…;
(6) the need to avoid unwarranted sentence disparities; and
(7) the need to provide restitution….

3

(internal citations omitted). This Court should reject the applicable Guidelines range in this case on policy grounds.

   **B. A variance is warranted because the § 2G1.3 enhancements applied in this case constitute "double counting" and do not punish conduct that is more aggravated than the typical offense.**

An advisory sentencing guideline represents a "rough approximation of sentences that might achieve § 3553(a)'s objectives only when it is the product of empirical data and national experience, guided by a professional staff with appropriate experience." *United States v. Arrelucea-Zamudio*, 581 F.3d 142,155 n.12 (3d Cir. 2009) (internal citations omitted).

Throughout this section, comparison is made to other Guidelines, including the child pornography guideline, U.S.S.G. § 2G2.2, even though this is not a child pornography case. This is because several of the enhancements, like the use-of-computer enhancement, are similarly found in other Guidelines, and the same arguments about double-counting apply. This is also because, like § 2G2.2, § 2G1.3 was developed in reaction to increased statutory penalties implemented by Congress, not empirical research and analysis.

As the Third Circuit has acknowledged, U.S.S.G. "§ 2G2.2 was not developed pursuant to the Commission's institutional role and based on empirical data and national experience, but instead was developed largely pursuant to congressional directives." *Grober*, 624 F.3d at 608. "[T]o say that the final product [in § 2G2.2] is the result of Commission data, study, and expertise simply ignores the facts." *Id*. Rather, "[a]t the direction of Congress, the Sentencing Commission has amended

4

the Guidelines under § 2G2.2 several times since their introduction in 1987, each time recommending harsher penalties." *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010).

Similarly, § 2G1.3 was developed in response to Congressional action in the "PROTECT Act" of 2003.[4] The base offense level of 24 (for all offenses under this guideline) was created as a result of the then-applicable five-year mandatory minimum offense under 18 U.S.C. § 2422(b), in order to create a level that would closely track the mandatory minimum.[5] This is the same amendment where a number of enhancements were made to § 2G2.2, including an expansion of the use-of-computer enhancement in § 2G2.2(b)(5) (now, § 2G2.2(b)(6)).[6]

Then, in the 2007 Guidelines, the base offense levels were expanded in response to the Adam Walsh Child Protection and Safety Act of 2006, which again enhanced penalties for existing sex offenses.[7] The new § 2G1.3 created an increased base offense level for some of the offenses in § 2G1.3, responding to the increase in the mandatory minimum penalty for § 2422(b) from five to ten years – not research from the Sentencing Commission.[8]

---

[4] 108 Stat. 1925.
[5] *See* Reader Friendly Version, Amendment (May 2004), at 18, *available at* https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20040430_RF_Amendments_0.pdf.
[6] *Id.* at 16.
[7] Pub. L. 109-248.
[8] *See* Reader Friendly Version, Amendment (May 2007), at 26, *available at* https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20070501_RF_Amendments_0.pdf.

Because of the similarities in the creation of § 2G1.3 and § 2G2.2, a similar analysis is appropriate. The history of this development of § 2G1.3, like § 2G2.2, demonstrates that the advisory Guidelines range should not receive the same weight in this case as it would ordinarily be afforded in other types of cases.

### 1. The use-of-computer enhancement applies in nearly every case under this guideline.

Specific offense characteristic enhancements "are meant to increase a sentence for conduct more aggravated than the typical type of offense." *United States v. Robinson*, 669 F.3d 767, 778 (6th Cir. 2012). For § 2G1.3, like §2G2.2, that principle is untrue.

When enhancements under a guideline do not reflect the relative culpability of the offender, they should be carefully scrutinized. It is for that reason that the Sentencing Commission recommended that the enhancement under Section 2G2.2 be amended to "'more meaningfully reflect the current spectrum of offense behavior."[9] A major flaw of § 2G2.2 is that "many of the § 2G2.2 enhancements apply in nearly all cases." *Dorvee*, 616 F.3d at 186. For example, of all sentences under § 2G2.2 in 2018, 96.6% involved a computer (qualifying for a 2-level increase pursuant to § 2G2.2(b)(6).[10]

---

[9] U.S. Sentencing Comm'n, Federal Child Pornography Offenses (Dec. 2012), at 323, *available at* http://www.ussc.gov/Legislative-and-Public-Affairs/Congressional–Testimony–and–Reports/Sex–Offense–Topics/201212–Federal–Child–Pornography–Offenses/.

[10] *See* United States Sentencing Commission, *Use of Guidelines and Specific Offense Characteristics for Fiscal Year 2018*,

The same is true for the use-of-computer enhancement in § 2G1.3. Indeed, the conduct penalized by the enhancement is the fact that either (a) Ms. Brown used a cell phone to communicate with the minor victim, or (b) used a computer to advertise the minor's prostitution. In the May 2007 amendments to the Guidelines, the Sentencing Commission noted that the two-level use-of-computer enhancement applied to 95% of offenders convicted under the related statute of § 2422(b) and sentenced under § 2G1.3 in 2006.[11] The Commission's goal in imposing this enhancement was to increase the Guidelines solely to arrive at a range of imprisonment at or near the mandatory minimum penalty of 120 months in § 2422(b).[12] This reasoning is inapplicable to Ms. Brown's conviction under § 2422(a), which carries no mandatory minimum penalty. Accordingly, there is no reason to apply an enhancement solely to match the 10-year mandatory minimum in § 2422(b).

Communicating by text message and/or phone call via a cell phone with the victim in this case – or using a cell phone or the internet to communicate with another person to engage in sexual conduct with the victim – does not make Ms. Brown's conduct "more aggravated than the typical type of offense." *See Robinson*, 669 F.3d at 778. Similarly, using a cell phone or the internet to advertise

---

https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2018/Use_of_SOC_Guideline_Based.pdf.
[11] Reader Friendly Amendment (May 2007) at 26.
[12] *Id.* at 127.

prostitution services is the norm. Counsel doubts it is common for solicitation of prostitution clients to occur without using the internet. Indeed, other courts have characterized this enhancement in the context of § 2G2.2 as akin to penalizing speeding, "but then adding an additional penalty if a car is involved." *United States v. Kelly*, 868 F. Supp. 2d 1202, 1209 (D.N.M. 2012) (citation omitted).

Therefore, a two-level variance is warranted.

### 2. The two-level enhancement for the offense involving a sexual act applies in nearly every case under this guideline.

The Sentencing Commission noted that that the two-level enhancement for the offense involving the commission of a sex act under § 2G1.3(b)(4) applied to 95% of cases in 2006.[13] Like the computer enhancement, the Commission's goal in imposing this enhancement was to increase the Guidelines solely to arrive at a range of imprisonment at or near the mandatory minimum penalty of 120 months in § 2422(b).[14] This reasoning is inapplicable to Ms. Brown's conviction under § 2422(a), which carries no mandatory minimum penalty.

In addition, the commission of a sex act is evident in the charge in Ms. Brown's case, which requires enticement or coercion of an individual "to engage in prostitution" or any illegal sexual activity.[15] This conduct is presumed and does not merit additional punishment beyond what is contemplated by the base offense level.

---

[13] Reader Friendly Amendment (May 2007) at 26-27.
[14] *Id.* at 127.
[15] *See* Information Memorandum, ECF No. 2, at Section A.2.

### 3. The "undue influence" enhancement does not reflect more aggravating conduct than the typical offense under § 2G1.3.

Similarly, the "undue influence" enhancement, although technically applicable, does not account for conduct that is more serious than average in Ms. Brown's case. Ms. Brown faces punishment for coercion or enticement of a person (here, a 17-year old) to travel to engage in prostitution.[16] The base offense level of 24 already accounts for "coercion and enticement" and "undue influence" does not carry additional meaning in this case, where the victim is 17 years old and not separated by many years of age from Ms. Brown.

### C. A variance is warranted due to Ms. Brown's rehabilitation while in custody.

Ms. Brown earned her GED in June 2019, while at the ACJ, as verified by the PSR.[17] She also completed these courses:

- All About Me, Two Sessions
- Words Without Walls, Creative Writing Workshop
- Bible Study, Parts Two and Three[18]

In "All About Me," Ms. Brown completed two program sessions, which are each 8 to 10 weeks long. Chaplain Vernetta Byrd, who supervises the program, writes that Ms. Brown "has shown she is serious about turning her life around and

---

[16] *See* Count 1 of the Information, ECF No. 1.
[17] PSR ¶ 61.
[18] PSR ¶ 61. Certificates are also attached as Exhibit G.

putting in the work necessary to do so."[19] In the second session of the program, Ms. Brown "returned to support new attendees."[20] She continues:

> Though none of us can say how a person's future will turn out, if Ms. Brown continues to apply what she has and is learning with the determination to change, her chances are good. My hope is that this experience will equip her to make the necessary changes now to have a better and different future.
>
> Sincerely,
>
> Chaplain Vernetta Byrd

Ms. Brown has also worked hard to connect to others and form healthy, positive relationships while at the ACJ. One of her friends, a fellow inmate, participated in many of the same programs as Ms. Brown, including the GED, Creative Writing, and All About Me. Ms. Beaver writes that at the GED graduation ceremony, because Ms. Brown's family could not make it in from out of town, "my family and I took the liberty in having [Ms. Brown] accompany us at our table."[21] She says that she and Ms. Brown "as a team have taken steps to making [their incarceration] a journey and learning experience instead of lost time."[22] In thinking through the material required of the "All About Me" class, they had to "dig deep"

---

[19] Letter from Chaplain Vernetta Byrd, dated October 24, 2019, attached as Exhibit H.
[20] *Id.*
[21] Letter from Britny Beaver, dated September 14, 2019, attached as Exhibit I.
[22] *Id.*

and had "massive amounts of talks" with counselors and with each other along the way.[23]

### D. Further rehabilitation is best-achieved in the community.

Ms. Brown has already begun to rehabilitate herself, as demonstrated throughout this memorandum and in counsel's separate filing. Continued rehabilitation to prevent recidivism is the best way to protect the public from Ms. Brown's risk to commit future crimes. That rehabilitation is best achieved in the community.

First, the BOP is realistically unable to guarantee mental health treatment at all, let alone the weekly, individualized therapy that Shelby Summer receives in the community. According to the 2017 Department of Justice publication, 74.6% of prisoners reported a history of "a mental health problem" and received counseling from a trained professional (including a psychiatrist, psychologist, social worker or nurse) during their lifetime.[24] But only 26.7% of these same prisoners received counseling or therapy in prison. Of the 60.9% of prisoners reporting serious psychological distress, only 25.8% received counseling or therapy from a trained professional in prison.[25]

---

[23] *Id.*
[24] U.S. Dep't of Justice, *Indicators of Mental Health Problems Reported by Prisoners and Jail Inmates, 2011-2012* (June 2017), *available at* https://www.bjs.gov/content/pub/pdf/imhprpji1112.pdf.
[25] *Id.*

Indeed, research shows that a prison sentence can harm low-risk offenders like Ms. Brown. Instead, recidivism is best reduced through treatment in the community, as opposed to correctional intervention.[26] Low-risk offenders like Ms. Brown have a higher likelihood of recidivism following placement in intense correctional settings, where they are exposed to higher-risk offenders and placed in a setting that "disrupt[s] the factors that make them low-risk," like their job, family, and social support systems.[27]

Instead, rehabilitation is best achieved in the community, where there are programs and resources readily available to Ms. Brown and tailored to her specific needs, as explained in counsel's additional filing.

**E. Protecting the public does not require Shelby Summer Brown's further incarceration.**

Respect for the law is evident in Ms. Brown's conviction, and does not necessitate a longer prison sentence. "Respect for the law is promoted by punishments that are fair, however, not those that simply punish for punishment's sake." *United States v. Stern*, 590 F. Supp. 2d 945, 956-57 (N.D. Ohio Dec. 19, 2008). "A sentence that is disproportionately long in relation to the offense is unjust and . . . fails to promote respect [for the law]." *United States v. Ontiveros*, 2008 U.S. Dist.

---

[26] Understanding the Risk Principle:  How and Why Correctional Interventions Can Harm Low-Risk Offenders, *Topics in Community Corrections* (2004), *available at* https://www.ncsc.org/~/media/Microsites/Files/PJCC/H%20RiskPrinciple.ashx.

[27] *Id.* at 7.

12

LEXIS 58774, 2008 WL 2937539, at *3 (E.D. Wisc. July 24, 2008). "There is no reason to believe that respect for the law will increase if a defendant who deserves leniency is sentenced harshly any more than there is reason to believe that respect for the law will increase if a defendant who deserves a harsh punishment receives a slap on the wrist." *Stern*, 590 F. Supp. 2d at 957.

### F. A sentence without further prison time provides for sufficient deterrence.

It is not the length of Ms. Brown's potential sentence, but rather, the certainty of punishment that drives the deterrent effect of prison time.[28] A study by the U.S. Department of Justice concluded that "[s]ending an offender to prison isn't a very effective way to deter crime . . . . Prisons actually may have the opposite effect."[29] This is why a lengthier sentence for Ms. Brown cannot be justified on the basis of deterrence. "[L]engthy prison sentences cannot be justified on a deterrence-based, crime prevention basis."[30] The Brennan Center for Justice similarly concludes, "Empirical studies have shown that longer sentences have minimal or no benefit on whether offenders or potential offenders commit crimes."[31]

---

[28] National Institute of Justice, Five Things About Deterrence (Sept. 2014), *available at* https://ncjrs.gov/pdffiles1/nij/247350.pdf.
[29] *Id.*
[30] Daniel S. Nagin, Deterrence in the Twenty-First Century, 42 Crime & Just. 199, 202 (2013).
[31] Brennan Center for Justice, What Caused the Crime Decline? 26 (Feb. 2015), https://www.brennancenter.org/publication/what-caused-crime-decline.

In addition, imposition of a sentencing alternative to additional imprisonment is still a serious sentence. Supervised release, along with further restrictions that may be imposed like community confinement or home detention, is a serious restriction on a person's liberty. The Supreme Court has recognized "[p]robation is not granted out of a spirit of leniency . . . . [] probation is not merely 'letting an offender off easily.'" *Gall v. United States*, 552 U.S. 38, 48 n.4 (2007) (citation omitted). The Court further recognized "probation or parole conditions imposed on an individual can have a significant impact on both that person and society . . . . Often these conditions comprehensively regulate significant facets of their day-to-day lives . . . . They may become subject to frequent searches by government officials, as well as to mandatory counseling sessions with a caseworker or psychotherapist." *Id.*

There is no question that, either as a condition of probation or supervised release, Ms. Brown will be subject to severe restrictions due to the nature of her offense, including that Ms. Brown will be subject to sex offender registration requirements for 25 years following her conviction.[32] Registration requirements restrict where individuals can live and work, and even whether they can be near a school or playground.

---

[32] *See* SORNA, Office of Sex Offender Sentencing, Monitoring, Apprehending, Reporting, and Tracking, Office of Justice Programs, https://www.smart.gov/sorna.htm.

14

### G. Incarcerating Ms. Brown unnecessarily burdens the taxpayers.

Courts may no longer ignore the reality that the rapid growth of the American prison population has, in addition to destroying lives and communities, put significant strain on taxpayers. The cost of supervision in the community is $4,472 per year, as compared to $37,448 per year of incarceration.[33] On March 24, 2015, Justice Kennedy condemned our reliance on lengthy incarcerations and remarked to the United States House of Representative Appropriations Committee, that "it would be wiser to assign offenders to probation and other supervised release programs."[34] Recent amendments to the sentencing guidelines also note "the significant overcapacity and costs of the Federal Bureau of Prisons."[35]

---

[33] PSR ¶ 81.
[34] Jess Bravin, Wall Street Journal, Two Supreme Court Justices Say Criminal-Justice System Isn't Working, available at http://www.wsj.com/articles/two-supreme-court-justices-say-criminal-justice-system-isnt-working-1427197613.
[35] U.S.S.G. Amendment 782 to the Sentencing Guidelines ("The amendment was also motived by the significant overcapacity and costs of the Federal Bureau of Prisons. The Sentencing Reform Act directs the Commission to ensure that the sentencing guidelines are 'formulated to minimize the likelihood that the Federal prison population will exceed the capacity of the Federal prisons'.").

## CONCLUSION

For all of these reasons, along with the reasons in Ms. Brown's other filings, and those that will be presented at the sentencing hearing, after taking into account all of the § 3553(a) factors, a sentence without further incarceration is sufficient but not greater than necessary to fulfill the goals of sentencing.

Respectfully submitted,

*/s/ Sarah Levin*
Sarah Levin
Assistant Federal Public Defender